IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2019 Session

IN RE RAESHAD B.

Appeal from the Chancery Court for Sumner County
No. 2017-AD-11     Louis W. Oliver III, Chancellor
_____

No. M2018-00238-COA-R3-PT
_____

Nearly three years after a child was placed with them by an unlicensed child placing agency, the child's guardians petitioned to terminate the parental rights of the child's parents. The chancery court found two statutory grounds for termination: abandonment by willful failure to visit and abandonment by willful failure to support. The court also found that termination of parental rights was in the child's best interest. Only the child's mother appeals. We conclude that the evidence was less than clear and convincing as to each of the alleged statutory grounds. So we reverse the termination of mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., joined. RICHARD H. DINKINS, J., filed a concurring opinion.

Shyanne C. Riddle, Nashville, Tennessee, for the appellant, Askia T.

Wende J. Rutherford, Nashville, Tennessee, for the appellees, Barry B. and Jennifer B.

Jacob Fordham, Gallatin, Tennessee, Guardian ad Litem.

## OPINION

## I.

### A.

On April 11, 2014, a volunteer with Jonah's Journey contacted Barry B. and Jennifer B. (together, "Guardians," or individually, "Mr. B." and "Mrs. B.") about 11-

month-old Raeshad, whose mother Askia T. ("Mother") was incarcerated. A ministry of a local church, Jonah's Journey assisted incarcerated mothers by placing their children with Christian families. It was regarded as "an alternative to the children going to foster care with Department of Children's Services." It was not licensed as a child placing agency. *See* Tenn. Code Ann. § 37-5-501(b)(7) (2014) (defining "child placing agency").

Guardians had attended an informational meeting for Jonah's Journey the previous month. According to Mrs. B., prior to the April call about Raeshad, "[a]ll we did was sign a piece of paper and I think we left our phone number and our e-mail address maybe." In comparing Jonah's Journey with their previous years of experience as foster parents for the Department of Children's Services, Mr. B. agreed that "there was less red tape with Jonah's Journey, less paperwork, less oversight [and] rules and regulations."

During the call, the volunteer for Jonah's Journey informed Guardians that the child had to be placed that day. Guardians were also informed that Raeshad required further surgery for clubfeet. Guardians agreed to the placement, and Raeshad came to their home with only the clothes on his back, a bottle, a blanket, and a limited power of attorney that had been executed by Mother. The limited power of attorney, which misspelled Jonah's Journey as "Jonas Journey," granted Guardians temporary custody of Raeshad and authorized Guardians to "secur[e] and mak[e] any necessary provisions for my child [sic] care, comfort, maintenance and any medical care, treatment or support." The power of attorney further specified that the temporary custody would only remain in effect until Mother's release from custody.

The last minute arrangements were never part of the plan. Mother became pregnant with Raeshad while on parole for felony drug possession. After violating her parole, Mother became concerned that she might be arrested during the pregnancy or just after giving birth. Leaving the child with his father, Rae B. ("Father"), was not an option for various reasons. And Mother did not want the child to go into the state's custody.

Through Jonah's Journey, Mother met a prospective couple, other than Guardians, who were willing to care for Raeshad during her incarceration. Mother planned to let the other prospective couple take Raeshad from the hospital. But after giving birth, Mother had a change of heart. She decided to take Raeshad home and stay with him through an initial surgery, which was to take place in the coming months, for his clubfeet. The need for multiple surgeries had been revealed through an ultrasound during Mother's pregnancy.

Mother cared for Raeshad through his first surgery, but she was arrested just shy of Raeshad's first birthday. By that time, the other prospective couple could no longer take Raeshad, so Jonah's Journey contacted Guardians. Mother met Guardians for the first time when they brought Raeshad to the prison for a visit. Guardians continued to bring the child for visits every other week throughout Mother's incarceration.

2

In October 2014, Mother moved to a step-down program in Chattanooga. Despite the over 100 mile distance between Guardians' home and the Chattanooga facility, Guardians continued to facilitate visits between Mother and Raeshad. On January 21, 2015, Mother was released.

Following her release, Mother moved in with a relative, Thiakia T. ("Cousin"), in Antioch. Although by its terms the limited power of attorney and thus the temporary custody had expired, Mother and Mrs. B. both proceeded as if the transition would not be immediate. Since Mother's incarceration, another entity had taken over the work of Jonah's Journey, and it was now a licensed child placing agency. But Mother did not agree to participate in the licensed program. So, as Mrs. B. described the situation, "[i]t was up to the mother and the caregivers to work things out."

To begin, Mother and Mrs. B. agreed to an overnight visit. Their recollections of the timing of that first post-release visit differed. According to Mrs. B., the visit took place nearly a month after Mother's release. According to Mother, she visited ten days after her release. Both did agree that Mrs. B. brought Raeshad to Cousin's home for the visit.

At that time, Mother planned to move from her cousin's home into transitional housing offered through a local non-profit. When that plan did not work out, Mother led an itinerate life. While Mother visited her child roughly once a month during the first half of the year, she did not visit at all in August, September, or October. Mother's moves and lack of communication frustrated Mrs. B. As Mrs. B. described matters, "[i]t was very vague, a lot of unanswered questions, and I don't want to be a drill sergeant. I didn't want to be her mother. I just wanted to know a couple of things for safety purposes, for a safe environment for [Raeshad]."

In November, Mother called Mrs. B., requesting that she bring Raeshad to the home of a friend of Mother's for a visit. Mrs. B. declined because she "didn't know the friend's name or situation." Instead, she agreed to meet Mother at a local church on a Friday. Saturday morning, Mrs. B. received a call from a friend who had spotted Raeshad at a restaurant where Mother worked. Mrs. B. called Mother, and Mother explained that she had been called into work unexpectedly and that Raeshad was never out of her sight. Mrs. B. described Mother as very angry with Mrs. B.'s inquiry.

Later that evening, Mother called Mrs. B. back to say that she was keeping Raeshad. But the very next day, Mother texted Mrs. B. to ask if she could take Raeshad because Mother had to work. It was as if the previous conversation never happened. Mrs. B. agreed to pick up the child.

In December, Mother visited with Raeshad again. Then on the day after Christmas, Mother called to inform Mrs. B. that she was moving to Jackson, Tennessee,

and taking Raeshad with her.  Mother claimed that she had first alerted Guardians to her potential move in October.  Mother's mother lived in Jackson, and it was Mother's hometown.  As Mother later explained,

> Nashville was not doing it for me.  It was all closed doors.  I'm an incarcerated woman.  I have felonies on my background.  Nashville was just beating me down, so it was not like I volunteered just to go away and get away from everybody freely, I needed to get away because either I was going to go back to the same stuff I used to do in my past or probably would have wind [sic] up dead, homeless on the street.

Mrs. B. opposed the idea of Mother taking Raeshad with her.  She suggested that Mother first get a job, an apartment, and arrange for child care in Jackson.  According to Mrs. B.,

> I kept reiterating it would be best if [Mother] had a job, place of [her] own -- just get those two things -- were crucial to having stability, and it was not -- it was not being met with any kind of agreement.  She was going to come get him regardless. She did not like what I was saying.

So she told Mother "that [they] were going to let a judge decide because [Mother] wasn't doing anything stable in [Mrs. B.'s] opinion, and [Guardians] had a little experience with DCS."

On December 29, 2015, Guardians did go to the clerk's office for the juvenile court to explain their situation.  But they were advised that they needed an attorney.

Faced with Guardians' refusal to let her take her child, Mother contacted the founder of Jonah's Journey, but by that point, she was no longer associated with the program.  The founder remembered being confused by both the call and why Mother did not already have her child.  She recalled the following about the call:

> [Mother] was really upset with me and she was having words with me, and I was, like, I don't understand what you're wanting me to say.  She was trying to get me to say she was part of a program.  I was, like, you were part of Jonah's Journey, the ministry.  You're not part of Jonah's Journey, the licensure.  I'm not understanding what you don't understand.  You could have gotten your kid the day you walked out of prison.  . . .
>
> So I think that was the same conversation she was, like, they're going to take me to court.  I was, like, go get your kid.  Go fight and get an attorney and get your baby.  And then I remember she was -- I was, like, what are [Guardians] asking you to do?  She said, get a job and have

4

somewhere to live. I'm going to Jackson. I was, like, go get a job and find somewhere to live and then go get your boy.

When asked later why she did not get her son despite Guardians' refusal, Mother said

When they told me I couldn't come and get him, I guess I was scared a little bit just to pop up on they [sic] doorstep asking if I could get Raeshad because I don't know if they was [sic] going to call the police on me or what was going to happen . . . .

So Mother moved to Jackson without her child.

### B.

Guardians did not hire an attorney until February 2016. By that point, they had heard again from Mother, who had called to apologize. According to Mrs. B., Mother also conceded that it was probably best that Guardians had kept Raeshad because Mother's job in Jackson had not worked out. Mrs. B. felt like nothing was changing. Mother recalled speaking with Mrs. B. and being told that Guardians wanted custody. According to Mother, Mrs. B. proposed an open adoption, but Mother was not interested.

In February, Guardians filed a petition for protective custody in the Juvenile Court for Sumner County, Tennessee. On April 5, 2016, the juvenile court entered an ex parte restraining and protective order "[r]estraining Mother from interfering with [Guardians'] sole protective custody of the minor child" and "[r]estraining Mother from exercising any further visitation pending further orders of this Court." The words "or any agreement of parties" were handwritten after "further orders of this Court."

A few days before the court entered the restraining order, Mother called Guardians from the Madison County jail. Mother had been arrested on an attachment for criminal contempt of court for failure to pay child support for her daughter who was in the custody of a grandmother living in Shelbyville. After she made bond, Mother called again to say that she would be coming back to get Raeshad. Mrs. B. responded by texting Mother a picture of the restraining order.

On April 20, 2016, the juvenile court conducted a preliminary hearing. The court appointed a guardian ad litem and counsel for Mother and Father. The court also ordered that Raeshad would remain in the temporary custody of Guardians. Mother saw her child briefly at the hearing.

After the preliminary hearing, Mother saw Raeshad only twice more that year. In July, Mother was in Gallatin for a court date, so she contacted Mrs. B. to ask if she could see Raeshad. Mrs. B. met Mother at a local restaurant, and Mother visited with Raeshad

for less than an hour. Then on December 23, coming into town from Jackson, Mother asked if she could drop by Guardians' home with Christmas gifts for Raeshad. Guardians agreed, and Mother visited for approximately 25 minutes.

On January 12, 2017, the parties returned to the juvenile court for a hearing on the Guardians' custody petition. From that hearing, the court entered an agreed order providing that Guardians would retain legal custody of Raeshad and that Mother would be allowed to exercise visitation on specific dates and times. Specifically, Mother was "granted specific visitation at [Cousin's] home" in Antioch every other Saturday beginning on January 21, 2017, through April 29, 2017. The first three visits would last 4 hours, while the remaining visits would last 8 hours. At Guardians' request, the agreed order also provided as follows:

> The parties agree that if the Mother is more than 30 minutes late to any of these visitations, then the [Guardians] may leave without consequence. If the [Guardians] are late, then that time shall be allowed to be made up at the end of the scheduled visitation.

Because Mother was in town for the hearing, Guardians agreed to a short visit with Raeshad. But when Mrs. B. picked up Raeshad from day care and she explained that he would be seeing his mother, Raeshad became distraught and clung to Mrs. B. Raeshad could not be consoled by either Mother or Cousin, who drove Mother to the day care for the visit. Ultimately, Raeshad crawled into Mrs. B.'s car and stayed there.

The failed visit at Raeshad's day care convinced Mr. B. that things needed to change. According to him, he and Mrs. B. only agreed to visitations with Mother "reluctantly," because we were "advised . . . that that's what the Court wanted to see."

On January 21, 2017, the first scheduled visit under the agreed order, Mrs. B. transported Raeshad to Cousin's home. After Mother spent the full four hours with Raeshad, Mrs. B. returned to pick the child up. According to Mrs. B., Raeshad had "kind of a blank stare, just kind of a glazed look." After the visit, Mrs. B. testified that the child was clingy and began exhibiting concerning behavior, including sucking on toys and his blanket, and experiencing nightmares.

On the day before the next scheduled visit, according to Mrs. B., Mother called to speak with Raeshad and told him that she would be taking him to a favorite restaurant. Mrs. B. then called Mother back to tell her to plan on picking up Raeshad from Guardians' home at 9 a.m. because they "had some scheduling things, some soccer [involving Guardians' other children]." Mrs. B. "would pick him up in Antioch at 1:00 [p.m.]."

6

According to Mother, she consulted with her attorney after Mrs. B.'s call, and the attorney advised that Mrs. B. should bring Raeshad to Cousin's home. So Mother called Mrs. B. to insist that she bring Raeshad to Cousin's home. In Mother's view, the responsibility fell on Guardians because Mother was traveling from Jackson for the visits. Although Mother admitted that Cousin had a car and could have taken her to Guardians' home, Mother explained, "I done [sic] what my lawyer told me to do." So the court ordered visit did not take place.

By that point, Guardians had already signed a verified petition to terminate Mother's and Father's parental rights. All that remained was the filing.

C.

On February 13, 2017, in the Chancery Court for Sumner County, Tennessee, Guardians filed their petition. They alleged the same statutory grounds for terminating each parent's rights: abandonment by willful failure to support, abandonment by willful failure to visit, and persistence of conditions.

The court conducted a trial over three days in November and December. The court heard from the Guardians, a professional counselor who had seen Raeshad and was accepted as an expert on child psychology and behavior, and long-time friends of the Guardians who were also familiar with Raeshad and his interactions with Guardians. The court also heard from Mother, Father, and a counselor who had led a family reunification program attended by Mother at the prison. At the close of Guardians' proof, Mother and Father moved for dismissal of persistence of conditions grounds for termination, which the trial court granted.

In a thoughtful and comprehensive order, the chancery court terminated the parental rights of both Mother and Father. The court found clear and convincing evidence that Mother and Father abandoned their child by willful failure to visit. Although noting that Mother had visited three times in the four-month period preceding the filing of the petition to terminate, the court characterized those visits as merely token. Any inability to visit was due to Mother's own choices, such as moving out of Cousin's home and moving to Jackson. The court further determined that the ex parte restraining and protective order issued by the juvenile court constituted no barrier to visitation because it permitted visitation by agreement. In addition, despite being appointed counsel, neither parent sought relief from the restraining order.

The court also found clear and convincing evidence that Mother and Father abandoned their child by willful failure to support. Without dispute Mother and Father had failed to pay support during the four-month period preceding the filing of the petition to terminate. In the case of Mother, the court noted that Mother was employed full-time during the applicable period. In addition, during the applicable period, Mother was

7

compliant with orders of child support for her two older children. Finally, the court found clear and convincing evidence that termination of the parents' parental rights was in the best interest of Raeshad.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Statute identifies those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2018).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 544 (Tenn. 2015). Parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother challenges the grounds for terminating her parental rights. Specifically, Mother argues that Guardians failed to prove each ground by clear and convincing evidence.

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The parental termination statutes give alternative definitions for "abandonment." *Id.* § 36-1-102(1)(A) (2017). At the time Guardians filed their petition for termination, "abandonment" included "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights."[1] *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, because the petition was filed on February 13, 2017, the relevant four-month period is October 13, 2016, to February 12, 2017. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

To terminate parental rights on the ground of abandonment, the court must find the abandonment was willful. While the failure of the parent to visit or support presents a question of fact, "[w]hether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838. 864 (Tenn. Ct. App. 2005).

1. Willful Failure to Visit

We begin with the ground of abandonment by willful failure to visit. "[W]illfully failed to visit" is defined by statute as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The chancery court found that Mother visited with the child on the following dates:

---

[1] Effective July 1, 2018, petitioners no longer have to prove a parent's failure to support or to visit was willful. 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 174 (LexisNexis). Under the current version of the statute, the parent or guardian must raise, and bears the burden of proof on, the defense of "absence of willfulness." Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2018).

1. December 23, 2016 - Mother visited with the minor child at [Guardians']
home for approximately twenty-five (25) minutes.
2. January 12, 2017 - Mother visited/attempted to visit with the minor child
in the parking lot of his pre-school for approximately ten (10) minutes.
3. January 21, 2017 - Mother visited with the minor child for four (4) hours
per the Agreed Order entered in the custody action then pending in Juvenile
Court.

But the court found that these visits were token visits.

The term "token visitation" describes "visitation, [that] under the circumstances of
the individual case, constitutes nothing more than perfunctory visitation or visitation of
such an infrequent nature or of such short duration as to merely establish minimal or
insubstantial contact with the child." *Id.* § 36-1-102(1)(C). Although courts should
primarily focus on the parent's conduct during the relevant four-month period,

> the parent's conduct and the relationship between the child and the parent
> up to this point is relevant background and context for the necessarily fact-
> intensive evaluation of whether the visitation *during* the four-month period
> was merely "token." For example, the significance of facts such as the
> setting and the length of time of the visits during the relevant time period is
> better assessed with an understanding of the parent's prior efforts to forge a
> relationship with the child, and whether a bond between parent and child
> had previously been established.

*In re Keri C.*, 384 S.W.3d 731, 749 (Tenn. Ct. App. 2010).

As to Mother's prior efforts, the chancery court found that "Mother chose not to
assume full responsibility for the child when she was released and voluntarily allowed
him to remain in [Guardians'] care." And the court found that the testimony of
Raeshad's therapist "clearly established that [Mother] had failed to develop any kind of
parental bond with the child in the two years following Mother's release from prison."
Thus, the court concluded that the visits were token "based upon the number and duration
of the visits."

As found by the court, even after her release from incarceration in early 2015,
Mother permitted Guardians to care for the child full time. The parties agreed that
Mother should work on finding a place to live and a stable job before Raeshad would be
returned to her. Apparently, none of the parties appreciated the difficulty of these tasks.[2]
Mother visited with the child eight times in 2015, with some overnight visits. Although

---

[2] In addition to Mother's criminal record, she did not have a high school diploma. In June 2016,
she passed a high school equivalency exam.

10

infrequent, the visits seemed to go well other than concerns over whether Mother had the available resources to care for a child. By the end of 2015, Mother decided to move to Jackson. When Mother announced that she wanted to take Raeshad with her, she was met with resistance.

In 2016, the parties' relationship was strained and became litigious. The proof showed that Mother sought visitation much less and only saw the child three times in 2016. Before the January 12, 2017, agreed order setting specific visitation, the parties operated under an ex parte order entered by the juvenile court which "[r]estrain[ed] Mother from interfering with [Guardians'] sole protective custody of the minor child" and "[r]estrain[ed] Mother from exercising any further visitation pending further orders of this Court or any agreement of parties." The subsequent order granting Guardians protective custody of Raeshad did not address visitation.

Although Guardians make much of the fact that Mother could have visited by agreement of the parties, the evidence suggests an agreement for substantial visitation was unlikely after Mother's move to Jackson. Mrs. B. understandably wanted assurance that visitation would take place in a safe environment, requiring Mother to travel to the Nashville area for visitation. But Mother consistently had difficulty with transportation. And despite the extraordinary lengths Guardians undertook to facilitate visitation, over time Guardians clearly grew weary of Mother's lack of progress toward stability. Guardians both acknowledged that, in January 2017, they only agreed to visitation reluctantly. As Mr. B. testified, the agreed order allowing Mother visitation for several hours every other week "just didn't feel right," and after the incident at day care, they wondered if "there was any way this c[ould] be reversed." Yet, we agree with the chancery court that Mother could have sought the intervention of the juvenile court, either by asserting her superior parental rights or in seeking a reasonable visitation schedule.

With this background, we consider whether Mother's visits during the relevant four-month period amounted only to token visitation. We find no evidence that Mother's visits with Raeshad were perfunctory. Visits are perfunctory in nature when the parent "was merely physically present at visits and uninterested in her child." *In re Keri C.*, 384 S.W.3d at 750; *see also In re Nevaeh B.*, No. W2016-01769-COA-R3-PT, 2018 WL 896070, at *5-6 (Tenn. Ct. App. Feb. 14, 2018) (concluding that visits were perfunctory when mother "did not engage or interact with the Child so as to form any bond with her" during the few hours of visitation), *perm. app. denied*, (Tenn. May 10, 2018); *State Dep't of Children's Servs. v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003) ("The testimony of the caseworker, which was believed by the trial court, indicates that Mother spent her visitation sessions applying makeup, sleeping, and arguing with Father, rather than properly focusing her attention on and caring for the child."); *In Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *3-4 (Tenn. Ct. App. Sept. 29, 1997) (holding that father's visitation was

11

perfunctory in nature because he was "tired and sleepy" during the visits and because of his overall inattentiveness to the children).

Here, Mother brought Christmas presents to Raeshad on the December visit. After the court hearing on January 12, 2017, although her efforts ultimately failed, Mother tried to engage with the child by showing him Clifford and Ninja Turtles on her phone and by offering him gifts. We do not fault Mother for not trying to insist on visitation when the child was upset by that prospect.[3] As to the first court-ordered visit with the child, Mother exercised visitation for the full four hours, and no proof was presented that Mother did not engage or pay attention to Raeshad during this visit. *See In re Keri*, 384 S.W.3d at 750 (noting that mother's plan to bring presents for the child in advance of family gatherings, attempt to engage with the child, and phone contact "indicate[d] some level of interest in [the child] and in a relationship with her").

Whether Mother's visits were "of such an infrequent nature or of such duration as to merely establish minimal or insubstantial contact with the child" during the applicable time period is a closer question. While the court emphasized the fact that "Mother had only three (3) visits or contacts with the minor child in the four months prior to the filing of this action," Mother's efforts to contact the child by phone were not taken into account. *See In re Amelia M.*, No. E2012-02022-COA-R3-PT, 2013 WL 4715043, at *9 (Tenn. Ct. App. Aug. 30, 2013) ("Telephone calls may be relevant . . . as contact between parent and child."). We have previously held that a parent's "less than perfect visitation record is not proof of abandonment by clear and convincing evidence" where the parent "stayed in regular contact with the children by telephone and letters." *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *9-10 (Tenn. Ct. App. Mar. 2, 2009) (noting that mother's move to Illinois to be closer to family made visitations difficult but she was able to visit the children a handful of times during the relevant four-month period without any help from DCS).

According to Mrs. B., in 2015, Mother's calls and texts were "sporadic." But Mother generally would go "up to ten days to two weeks" without phone contact after the first year of her release. For her part, Mother testified that she "never stopped calling" to speak to the child during the relevant four-month period and also sent text messages. From our review, the record is silent as to how many of those phone contacts were with the child and how long each conversation, if any, took place.

In evaluating whether Mother's visits were of an infrequent nature, the court did take into account the missed visit on February 4, 2017. The visit did not occur because Mother insisted on Guardians transporting the child to Cousin's home, although Mother could have asked her Cousin to drive her to Guardians' home. Although the parties disputed whose responsibility it was to transport the child to Cousin's home, the order

---

[3] We also do not fault Guardians. Mrs. B. tried her best to make the impromptu visit work.

implicitly places the responsibility on Guardians. In pertinent part, the order provided as follows:

> The parties agree that if the Mother is more than 30 minutes late *to any of these visitations*, then the [Guardians] may leave without consequence. If the [Guardians] are late, then that time shall be allowed to be made up at the end of the scheduled visitation.

A logical interpretation of the provision is that each party was to meet "at [Cousin's] home" in Antioch, the agreed-upon location for visitation. Although possible, it would be unlikely that Guardians would be "late" arriving to their own home at 9:00 a.m., when the visits were scheduled to begin. So Mother's decision to stay at the agreed-upon visitation place, although it led to a missed visit, was understandable in light of Guardians' insistence on strictly following the order.

Considering Mother's visits, her testimony concerning phone contact, and the circumstances surrounding the scheduled February 4, 2017 visit, Mother did not have merely minimal or insubstantial contact during the four-month period preceding the filing of the petition to terminate. So we respectfully disagree that Mother engaged in token visitation during the applicable time period.

From the totality of the circumstances, we conclude that the evidence was less than clear and convincing that Mother abandoned her child by willful failure to visit during the four months preceding the filing of the petition. Guardians failed to meet their burden of proving this ground for termination.

2. Willful Failure to Support

We next consider the ground of abandonment by willful failure to support. A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

Here, Guardians presented proof that Mother worked during the relevant time period at either Waffle House or Huddle House and that she did not pay any child support. Although some proof was presented as to Mother's income outside of the four-month period, no proof was presented as to her income and expenses during the relevant four-month period. *See id.* (concluding that petitioners failed to prove the ground of willful failure to support even though father's income was $150,000 and paid only $3500 during the relevant four-month period because "[n]o evidence was introduced concerning

13

[his] monthly expenses"). Mother testified that, during the relevant four-month period, she did not have sufficient funds to pay all her bills.

Guardians did establish that Mother was subject to two separate support orders relating to her two daughters, one entered by the Juvenile Court of Wilson County and the other entered by the Juvenile Court of Bedford County. And the chancery court found it significant that, during the relevant four-month period, Mother was compliant with the Bedford County order after previously pleading guilty to criminal contempt for failure to pay support. But nothing was presented as to Mother's ability to pay *Raeshad's* support after taking into account all of Mother's expenses, including child support obligations.

We also find it noteworthy that Mrs. B. was concerned about Mother's ability to support Raeshad. She testified to occasionally providing Mother with financial support and groceries. One of the reasons she did not want to return Raeshad was because of Mother's lack of stability. According to Mrs. B., "there was never stability with a job or place to live."

On this record, we cannot conclude that the evidence was clear and convincing that Mother's failure to support was willful. The evidence of Mother's ability to pay support was lacking.

## B.

To terminate parental rights, at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g) must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1). As Guardians failed to prove by clear and convincing evidence a statutory ground for termination of Mother's parental rights, we do not reach the issue of whether termination of Mother's parental rights was in the child's best interest. *See In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (requiring that the party seeking to terminate parental rights prove by clear and convincing evidence both a ground for termination and that termination is in the child's best interest).

## III.

Based on the foregoing, we reverse the judgment of the chancery court terminating Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

14